The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States in His Honorable Court. Good morning everybody, please be seated. Welcome to the Fourth Circuit. We have four cases on the docket this morning. We'll begin with 18-1439, Rosa Ortez-Cruz v. Attorney General William Barr. Mr. McKinney. Good morning, and may it please the Court. My name is Jeremy McKinney of McKinney Immigration Law. I am here with my co-counsel Anne Marie Petitioner Rosa Ortez-Cruz. We are asking the Court to review the denial of two applications for protection, withholding of removal, and withholding or deferral of removal pursuant to the United Nations Convention Against Torture or CAT. But at its core, this is a case with one central question. Will Rosa Ortez-Cruz be safe if she is deported to Honduras? Again, what is before the Court is whether the Department of Homeland Security successfully demonstrated that by preponderance of the evidence. Now, as established in her credible testimony and through corroboration in the record, Rosa is a native of Honduras who as a teenager Can I just, we know the facts of the case, and I just want to try to take you right away to one of my big questions, which is whether, I mean, isn't it just sort of a matter of common sense that if your client's abusive partner has been out of contact for 15 years that he's probably moved on? Can't the agency rely on that kind of common sense intuition here? No, not in the domestic violence context. What you had here was an argument that was lodged by the immigration judge that asserts that the passage of time in this context is enough to demonstrate a fundamental change in circumstance. Now, you have to, the judge has to rely on the administrative record before him or her. In this administrative record, there was literally nothing in the record to suggest that passage of time would be good enough. Except the passage of time, 15 years, right? Well, it's, the persecutor in this case followed the petitioner to the United States in 2003 and was purportedly deported, and then in 2016 made contact with the petitioner and the petitioner's son through social media, through Facebook. So it's not to say that there was no... Did the agency credit that evidence, the contact through Facebook? I thought that that was not credited. It was the immigration judge, the immigration judge found that it was in need of corroboration, and so the immigration judge did not give it weight. It was admitted, and her testimony was found to be credible. But not that particular portion of her testimony. In fact, the immigration judge gave her an opportunity to go out and retrieve her phone to corroborate that assertion, and she didn't do it. This doesn't appear on the record, so I don't think we're entitled to give at least that aspect of her testimony any weight. Understood, and going back to the original point regarding passage of time, what the petitioner presented during her case was an expert witness, Julie Owens. Now, her expertise in the area of domestic violence was credited to her by the immigration judge, and not disputed by the Department of Homeland Security during her individual hearing. As Julie Owens' expert testimony addressed, the lay belief that passage of time and distance mitigate risk is wrong in the context of domestic violence. Only evidence of accountability and rehabilitation actually reduce the risk. The expert specifically discussed a case in the record in which there was a 28-year period with no contact which culminated in the murder once the persecutor was able to locate and access his victim. So the immigration judge, I guess in the general, generic sense, found that the particular expertness Owens, I believe, was credible in the sense that I guess she testified sincerely as to her opinions, but then he also suggested that there were substantial problems with her testimony, much of which he thought was speculative. Part of the problem here is we don't really know which portions of any of the testimony he credited or not, so what are we supposed to do with that evidence? I think it is a, Judge Diaz, I think it is a key error in the immigration judge's opinion. What he called, the phrase that the immigration judge used was faulty assumption. Faulty assumption. He pointed to the expert witness and said, well, you're basing your testimony on the faulty assumption that this person is still dangerous. You haven't demonstrated, there's no evidence out there that he has not been rehabilitated. That's the key error, your honors, because the burden was not on the petitioner to demonstrate that. The burden was on the Department of Homeland Security. Again, it is undisputed that this man took a knife, stabbed the petitioner repeatedly in the gut, resulting in an 18-day hospitalization in Honduras and her fleeing for her life. Now, the immigration judge determined that that was past persecution. Pursuant to the plain language of the regulation, that then shifts the burden. DHS at that point shall, shall have the burden of demonstrating that is either that there's been a fundamental change in circumstances or that it is safe and reasonable for the petitioner to relocate in a specific area of Honduras. Can I ask you a question about the burden? I'm hoping you can help me out and I'll ask your colleague as well. I was genuinely perplexed. I could not understand the IJ's opinion. At an earlier part of the opinion, before he applies the burden shifting rule, there's just a long discussion. It's, you know, pages like 103, 104, 105 in the JA where he clearly puts the burden on the petitioner to prove that she cannot return safely. And then he said, and it ends by saying, so she failed to meet her burden of proof to establish eligibility for asylum. Was there an asylum, what's going on here? It was not an asylum claim. It was withholding and a cat claim. I think that often, I think all of us, practitioners and the court, we all tend to fall into the usage of asylum language in that administrative forum. I would argue accidentally because so often asylum accompanies withholding and the standards, while there's a different standard of proof, well founded versus a clear probability or more likely than not. But other than that, they are essentially identical. So I would imagine that Judge Petnato had used the word asylum erroneously. But then there's a problem, right? Because the IJ is very specific. The burden is on the respondent, your client, to prove that her abuser remains dangerous. But then later in the opinion, there's at least language saying the right standard. I'm having a lot of trouble figuring out what standard the IJ applied in this case. And I have had, I have struggled with that, with the IJ's opinion. I have also equally struggled with the board's opinion. Again, here the board did not adopt the IJ's opinion explicitly. The board in its two-page opinion never even provided what its standard of review would be. It never detailed it. And you can't gain, you can't glean what standard that the IJ applied. They used phrases like, we agree with the IJ. The IJ supported. They used that type of terminology instead of conducting a de novo review when the regulation, again, plain language of the regulation, reserves clearly erroneous review for factual questions. All of these questions, fundamental change in circumstances. Reasonable relocation. They are mixed questions of law and fact. And as we've seen from, in all the litigation that has sprung out since the passage of the Real ID Act, we're seeing a lot of litigation of these questions of what standard of review do we apply to these types of mixed questions. So Mr. McKinney, should the result then be, rather than us in the first instance trying to figure out what this record says in light of the evidence and the standard of review, is the result here remand to the IJ to apply the correct, to make it clear that he is applying the correct standard of review in this case? I think that that would be the narrowest way of resolving this case because you cannot glean that from the IJ opinion or the board opinion. But under the circumstances of this standard of review that this court applies, the petitioner prevails on her claim for withholding a removal. Well, what about the issue of changed circumstances or at least an ability to relocate within Honduras? Why isn't it intuitive or common sense to suggest that the petitioner in this case could easily, perhaps not easily, but with some effort, relocate to some distant part of the country where she would be safe? Okay. So looking at the evidence of record, Judge Diaz, there's no evidence that the mother's home, which was the only place in Honduras that was identified as a potential safe location, that there's no evidence in the record that that would be safe or that it would be reasonable in the circumstances. Identified by who? I guess she identified that as an option, but why isn't it reasonable to suggest other places? I think it would have been adamantly reasonable for DHS to provide evidence and argument of a specific place. Again, the case law from this circuit and other circuits point to the fact that DHS successfully rebuts the presumption when they present, introduce a particular area that could be safe in the country of return. We're not dealing with the typical case that you see, a gang violence case or a case of political persecution. You're dealing with an individual persecutor, her husband. And so what is DHS supposed to do? Put a map up on the wall and throw a dart and say, go there? What's the evidence supposed to look like? The regulation provides, the regulation at 8 CFR 1208.16, subsection B, subsection C, subsection 3, provides really good guidance on this point where it basically provides different factors that DHS can use to meet its burden of proof. For example, they could point to a specific area that is relatively free of civil strife. That's not what this case is about. This is a case of domestic violence. Of course, we don't even know where her husband is. That's correct. So I suppose that's not your problem. It's DHS's burden to suggest otherwise. But that issue of political strife and those other factors just don't seem to apply here. One of the factors that is especially relevant, Judge Diaz, is judicial infrastructure. That is one of the factors listed in the regulation. DHS could have pointed to the fact that there was successfully prosecuted, where the judicial system was stable enough. But what the record has, and again, that's what we're looking at before the court, and frankly, what the immigration judge should have looked at before rendering the decision, you've got a country that has what's called an impunity rate for domestic abusers that is almost 100%. In other words, almost 100% of domestic abusers in Honduras get away scot-free without any consequence from the government. If the government had come in and been able to show where the abuser was, would that have been enough? He's over here, so we'll put you over there. They would have to demonstrate that the area that Rosa should relocate to was safe and that under the circumstances, it's reasonable for her to go there. For example, under reasonableness, the question would be, you would look at factors beyond the danger. You would look at all the circumstances, including whether she could support herself, whether she would, the dangerousness of that particular area. None of this happened, and it seems like it looked to me as though the agency, and perhaps not impermissibly, but kind of conflated the two questions. The basic idea was, it's been 15 years, he's not after you anymore. There have both been changed circumstances, and for the same reason, you can safely relocate. That's basically the analysis, right? I would agree with your characterization of the opinion. Wasn't there also evidence that even when she was in the country, and when she was at her mother's house, that he didn't, he's never made contact with her mother, or been to her mother's house to look for her? That was the evidence on relocation, isn't that right? On the, okay, so after the petitioner was stabbed, again, brief aside, I don't know if you saw that, Judge Rushing, the board characterized it as cut her arm, just to give you an idea of the kind of downplay that the agency engaged in here. She was stabbed repeatedly in the gut with a knife, and the slash in the arm was simply her trying to defend herself. But after that, she went to her sister's house, not her mother's. The persecutor did not know where... Didn't her son stay with the mother, and in the entire time he was there, and the entire time she's been in the U.S., he's never contacted her, been there, so why wasn't that evidence that that would be a safe place for her to relocate? The, it is a factor that would be considered, Your Honor, but at the same time, you have to point blank her testimony that answers that precise question. The, now, first of all, the mother and the son are not members of this particular social group. They're not targets of the persecution. And the petitioner testified credibly before the immigration judge that the persecutor never contacted her mother because the persecutor knew she was in the United States. And then we also have her testimony that she was told that the persecutor followed her to the United States. So it is abundantly clear why, in this case, the persecutor would not have contacted the petitioner's mother in Honduras or the son in Honduras. My time has expired. Thank you, Mr. McKinney. We have some time left for rebuttal. We'll hear from the government. Is it Ms. Walhack? Yes, Your Honor. Good morning. Ann Wellhoff for Respondent, Attorney General Barr. May it please the Court. The petitioners in this appeal have the burden to show that the agency's decision is not only wrong, but the evidence compels an absolute, that there's no reasonable adjudicator could have come to the conclusion that the agency had rebutted the presumption. That's a very stringent standard. And on this particular record... Do you agree that the burden was on the government to show by a preponderance of the evidence that there had been either changed circumstances or that relocation was reasonably possible?  I would note that he was still talking about whether the petitioner... He hadn't talked about the burden shift yet. He was talking about credibility. And he said, okay, we do find her credible, but as is lawfully permitted, he said, I still want corroboration. He says, even though the court ultimately gave testimony, it nonetheless deems corroborating evidence necessary in evaluating her claim. And at that point, the immigration judge engages in a corroborating evidence as to both her past, the evidence regarding both past harm and future harm. It was an appropriate analysis. And he was simply... His conclusions at that point, at the end, were that, okay, we find her corroborating evidence as to the past harm sufficient. And therefore, we believe it and the corroborating evidence. But we don't believe that the corroborating evidence as to future harm is sufficient. At that point, she still... He hadn't... The judge hadn't switched over yet to apply the presumption. He does so on page 107. That's when the judge now talks about whether the government has met its burden. And it's very confusing. Even at that part of the opinion, there's a lot of language about what she has and hasn't established. And then when you get into the CAT section, the IJ says the record is inconclusive as to whether Mr. Oceda would seek respondent if she lived in southern Honduras. I mean, if the record's inconclusive, then... It is really not clear to me, and I have flyspecked this opinion to no end, that the IJ... It's clear that the IJ understands the rebuttal factors, right? That now we need to look at changed circumstances and relocation. But I just can't find any evidence that the IJ actually shifted the burden of proof to the government. Can you point me to any language that sort of would be... would kind of clear up the stuff about the record is inconclusive and things like that? Well, Your Honor, I believe he only says inconclusive in connection with the CAT claim. And there is no presumption of future harm with the CAT. I know, but I'm saying if the record is inconclusive... And if it's inconclusive, you can't make your burden of proof. And the burden was always on her for CAT. I understand that. But if the record is inconclusive, it's inconclusive. The record doesn't change between the analysis. The record is either inconclusive or the record shows, by a preponderance of evidence, that he will not seek her. I believe... I don't believe, and you may point out if I'm incorrect, I don't believe that there was any finding by the immigration judge that the record's inconclusive on whether or not... You're literally quoting it. What page are you on? On page 112 of the JA, the record is inconclusive as to whether Mr. and I don't know how to pronounce his name, Aseda would seek respondent if she lived in southern Honduras with her mother or in another area of the country. And that's prefaced all about his CAT claim. There is no proof. I understand that it is in the context of the CAT claim, but are you saying that the record is inconclusive on page 112 but not inconclusive on page 109? It's the same record. The burden on... No, I'm not saying that. The burden on CAT is squarely unheard. I totally understand that. And there's case law that says you don't meet your burden with an inconclusive record. I understand that you're saying as a descriptive matter, either the record is inconclusive or it's not. I don't believe... Maybe it's not the most articulate way to say it, but I think that the judge has clearly said, and certainly the board, whose decision is before this court, has said there's no question the government rebutted its presumption. I think the board made that finding. And the petitioners seem to feel that the government didn't come forth and meet its burden of production. And I would just say there is a really extensive record in this case, two full hearings. Now, I recognize that one of the immigration judges recused himself, but he didn't strike from the record any of the prior evidence. All the documentary evidence and testimony is still part of this record. And if you look, there's been two very grueling cross-examinations by DHS of this petitioner where she asks very specific and grueling questions about the very factors upon which the agency found government rebutted the presumption. The agency asks her, how long has it been since you've seen him? Didn't you stay there for eight months before leaving and he never saw you? Didn't you say he was right here in the D.C. metro area when you were here and he made no efforts to find you? Didn't your son stay there before? These are all part of a grueling cross-examination is producing evidence. The government is not in a position. Well, we said he made no efforts to find her. We don't know what efforts he made. He may not have been successful. But from her perspective, how does she know what efforts, if any, her husband made to find her? The circumstantial evidence that the government put forth in connection with meeting its rebuttal presumption burden, I believe you can conclude by a preponderance of the evidence that he hasn't made efforts because he hasn't found her in 15 years. Additionally, this is all presumed on an assumption that her social group is cognizable. That's not at issue. Why is that not at issue? Why is the government not raising that? The immigration judge said, or was it the board, we're just going to look at footnote two on page three. The board just accepted without deciding, okay, even if this is a particular social group. I'm just curious, I mean, what is the government's position as to whether this is a particularized social group? If ours went back on remand, would you argue that it's not? No, our position is that it is not, and there's been subsequent developments in case law on that very issue. However, because it wasn't an issue, I didn't 28-J this. But our position is that it is not. But in this case. I don't know that you could do that in this case. I think the government affirmatively waived that issue. There's a finding in the record. Correct. And we're not trying to argue that, Your Honor. We're saying on alternatively dispositive grounds, the government did come forth and meet its burden. The suggestion that the government, to meet its burden on relocation, would have to come in to the immigration court after culling through gosh knows how many documents in Honduras to find a successful prosecution, that's an unreasonable burden, and would not be necessary by a preponderance of the evidence standard. The government, I mean. Can I just tell you? I asked your counsel, your colleague also, sort of my real concern about this case. There does seem to be like a kind of common sense intuition that's driving the IJ. The IJ is very open about it. Like people change over 15 years. It's been 15 years. If there hasn't been any contact since then, he's probably matured in the last 15 years and he's probably gotten over it. And I understand sort of the intuitive appeal of that, but my concern is I just, I genuinely don't know whether that's how domestic abuse works or not, or whether it's possible that a domestic abuser might give up all his partners in hiding and then kind of reactivate if she became available to him again. And the only record evidence I can find on that is the petitioner's expert saying, yes, it can happen that way. Well, I think the record evidence that she's given up is the very facts about which DHS cross-examined her. You were in the country for eight months. She has not laid eyes on him since the attack. She says she was in hiding at her sister's. She left her son there for four years. There was no effort whatsoever to see the son. Not that the son is similarly situated. That's not the argument. But it is indicative. It's reasonable, entirely reasonable for the judge and the agency to look at the fact he hasn't done that in concluding maybe he hasn't really. That would be a good place to start if you're trying to find her, is get it through the son. It would also be a good place to start getting it through the mother. The petitioner testified that she put a great face on her. I saw this in a movie once, too, where like the domestic abuser is going after the family and terrorizing them to see if he can find his missing spouse. But what I'm looking for is like record evidence that that's the way it happens. And I just feel like I just don't know. I really don't know whether this is consistent with whether the evidence that you are pointing to, which I agree, the government brought out on cross-examination,  whether that evidence is consistent with the idea that, look, once she's gone into hiding, he leaves her alone. But if she comes back, he may still be angry. And I just don't know, except that we have this one expert who says, oh, yeah, there are cases where it's been 28 years with no contact, and then boom, she's back and he kills her. So I'm sort of left like really not knowing the answer to this very important question. Well, then I think that's important because the government, I believe, at least rebutted their presumption by a preponderance of the evidence, showing all these circumstantial facts of years and years of no efforts. So at least the government butted it to put it back on her. And then the burden at that point, she would have to show that this particular individual hasn't rehabilitated. He's still coming after her. I mean, the government, she's saying she can't even. that this particular individual would be more than likely to come back or was the evidence of record in this case from the expert about generalized notions about abusers and how they operate, would that have been enough? I don't believe that would have been enough to rebut her presumption because, well. See, the problem I have is that the IJ didn't really specify which portions of any of the expert testimony he relied on. Maybe you can help me with that. Because he found her to be, I guess, generally credible in the generic sense, but then didn't point to, well, I think this is speculative. I give credit to that. I don't give credit to this, regarding her opinions. Well, her opinion was that abusers that don't move on, don't rehabilitate, don't mature, don't seek help, those are the kind of abusers, obviously, that would continue to abuse any other future partner as well as her. And her own testimony of the experts was, I've never interviewed this person. I have no idea whether he's been rehabilitated. He could be off on another relationship three times over with other children. That sounds like it's inconclusive. And so we're back where we started. Well, I still think, though, that it's our position that the government came forth and rebutted the presumption, preponderance of the evidence. They're not just relying on lapse of time. They're relying on lapse of time with many circumstances that existed that would have permitted this person, if he was trying to get after her, to try and do so. And she admits that he didn't. I don't think that's just relying, sitting back and resting on passage of time. And the agency is allowed to make, it is reasonable to draw conclusions from those facts of, you know, he made no effort to get her when she claims he was right here in the same metro area as her. She said he tried to reach her on Facebook a few days before the hearing, and the agency said, well, did you save a screenshot? And she said no. I mean, that's like so critical. That would have been so important. And she doesn't save it. So he made no attempt to contact her when he's supposedly right here in this area. She admits that. I don't think that's just the government resting on lapse of time like when a child ages out. These are circumstantial facts, I believe, but facts that are very indicative that maybe this person is no longer a threat to her. And I think those are reasonable inferences to be drawn from those facts and enough to meet the preponderance of the evidence standard. In my view, it would be unreasonable to not take all those factors and the duration of time and all the opportunity and not find, as the agency did. So once the presumption is rebutted by a preponderance of the evidence, again, it's back on her to show she really does have an ongoing threat. I don't believe the materials that she's proffered do that. Certainly not the evidence testimony, the expert testimony, because the expert admitted that she has no expertise in Honduras and that many times abusers, once they're rehabilitated or get help, they're no longer threats. And she doesn't, maybe if you want to call it inconclusive on that, I believe it's at a point where we've already rebutted the presumption. And she has to show an ongoing threat once we rebut that. I believe the evidence, the government did come forth and rebut it. And again, the government also, there were some suggestions in their briefs that the government put on no evidence. The government submitted several documentary pieces of evidence and the government did engage in a very extraordinarily extensive cross-examinations twice, presented a very lengthy closing, submitted an appellate brief. The government did a lot to come forth and meet their burden of production. It's response position that the government did meet that burden of production and rebutted the presumption. Also, as to relocation, both of those findings, change in circumstances and relocation are both alternatively dispositive. They came forth and showed that her mother is there. Question for you about the, you called it the burden of production. The Fifth Circuit recently has ruled that the government doesn't have to produce evidence, that it's not necessarily a production burden or that they can produce evidence by cross-examining or what have you, that it's not as though it's recounting up how many witnesses each side has. I just wanted to check given what you were saying. Is that the government's position that you, you have to carry your burden by preponderance of evidence once it switches to you, but that you could do that by pointing to say if the abuser had died or some other evidence that the government's not putting in. It's the petitioner's evidence. Absolutely, yes, Your Honor. We agree with that position. To come forth and meet your burden, you can rely on evidence that is already in the existing record. They don't have to just go up and paper the record for no reason. If the evidence there can be pointed to, and they do so, which the government did here. In addition, I know there's some agency law that says a cursory cross-exam might not meet that burden of production. That's not what we have in this case. As you review the record, I think that you will see it was very geared towards the government making efforts to rebut the presumption. In my view, the government did rebut the presumption. Can I ask you just a very quick question before you sit down? Quick. So on the relocation point, it looked to me like both the IJ and the BIA relied, at least to some extent, on the petitioner's own statement that she could live with her mother. The respondent testified she could live with her mother if she returned, and the IJ said basically the same thing. But I looked at the statement, and she wasn't saying I could live safely with my mother. She was just saying if you send me back, I have nowhere to go but my mother's. So is the government relying on that statement or not? Yes. She does have her mother back there. So you are relying on that statement as evidence that she could safely live with her mother. As part of the evidence, yes. Is there any further questions? Thank you very much. Thank you. Mr. McKinney. Thank you, and again may it please the Court. Judge Harris, there's a fundamental difference between having a house available and whether that house is safe. I could visit, I could say, and I could literally visit Northern California this weekend. But that does not answer the question whether that visit would be safe or whether it would be reasonable for me to visit Sonoma this weekend. It's simply two different inquiries. And I found it puzzling that both the IJ and the Board sought out this one statement of testimony that the petitioner said that she would have to, in essence, go to her mother's because she had nowhere else to go. It has no relation at all as to whether that would be safe or whether it would be reasonable under the circumstances for her to do so. Going back to the nature of DHS's burden, Judge Rushing, I would contend that the plain language of the regulation requires action. And the actor is the one with the burden of proof. In this case, there are lots of things that we do not know, including the current whereabouts of the persecutor himself. But at the point where the petitioner demonstrated that there was a clear probability that she was persecuted in the past due to her membership in a particular social group, at that point, the burden shifted to DHS. In response, they didn't produce one document that had a bearing. They produced documents, but those documents related to their attack on the petitioner's credibility. But you would agree, you know, if the petitioner had testified that her abuser, she knew her abuser had passed away, that then the government could rely on that to carry their burden. They don't have to introduce their own evidence. Absolutely, Your Honor. What is disturbing in this case, and significant in this case, is that that action also involves doing what attorneys do, and that is providing, meeting your burden of proof by demonstrating to the adjudicator how you have met your burden of proof. DHS did not do that here. I believe my colleague incorrectly said that the trial attorney provided a closing. DHS did not provide a closing. What happened was, during the individual hearing, when all the evidence had been submitted and it was time for argument, the immigration judge looked to the trial attorney, asked for a closing argument, she waved. Then Ms. Dooley provided her closing argument. Then, even though we carried the burden of proof on the application as a whole, the immigration judge turned back to the DHS attorney to provide a second opportunity to provide some type of closing, some type of argument, and the trial attorney again waved closing argument. They waved closing argument not once, but twice. They presented no witnesses. They presented no documents. They presented no argument. Well, argument isn't evidence, and I suppose maybe the notion was they felt so confident in the evidence that they didn't feel the need to present argument. One, that is a plausible explanation, but I know that if we don't do our part, a particular argument is deemed either abandoned or waved, and here there was no action at all other than we would concede the cross-examination, which again spent the majority of its time attacking or seeking to attack the petitioner's credibility. But with that said, Your Honor, there's nothing in this record demonstrating action, and everything in the administrative record points to the fact that the petitioner would not be safe if she is deported to Honduras. Thank you for your time. Thank you, Mr. McKinney. We'll come down and greet counsel and move on to our second case. Thank you.
judges: Albert Diaz, Pamela A. Harris, Allison J. Rushing